# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

Charles W. Polinski,                                        Case No. 3:11CR190

            Movant

       v.                                        **ORDER**

United States of America,

            Respondent

This is a federal prisoner's collateral attack under 28 U.S.C. § 2255.

Charles Polinski pleaded guilty in 2011 to being a felon in possession of a firearm, 18 U.S.C. § 922(g), possessing a machine gun, 18 U.S.C. § 922(o), and unregistered manufacturing of a firearm, 26 U.S.C. § 5861(f). I sentenced him to 108 months of imprisonment. (Doc. 17 at 1).

Polinski now alleges that his trial lawyer was ineffective for not challenging a sentencing enhancement he received under United States Sentencing Guideline § 2K2.1(b)(4)(B), which establishes a four-level enhancement when "any firearm . . . had an altered or obliterated serial number." U.S.S.G. § 2K2.1(b)(4)(B).

It is undisputed that some of the firearms at issue in this case – several machine guns that Polinski made himself – never had serial numbers on them. (Doc. 51 at 6, 24–25). Polinski accordingly argues that it was impossible for him to have "altered or obliterated" the nonexistent serial numbers. He contends that counsel's failure to challenge that enhancement effectively

increased his sentencing range from between 87 and 108 months (the applicable range but for the § 2K2.1(b)(4) enhancement) to between 108 and 135 months (the range with the enhancement).

I held in a prior order that, absent some basis to excuse compliance with the limitations period, Polinski's motion would be untimely under 28 U.S.C. § 2255(f)(1). I also ruled that it was necessary to hold an evidentiary hearing to determine whether Polinski was entitled to equitable tolling. *Polinski v. U.S.*, --- F. Supp. 3d ----, 2016 WL 7664733 (N.D. Ohio 2016) (*Polinski II*).

That hearing took place on February 23, 2017, the parties submitted post-hearing briefs in early March, and the matter is now decisional.[1]

Because Polinski is entitled to equitable tolling, and because trial counsel's failure to challenge the § 2K2.1(b)(4)(B) was deficient and prejudicial, I grant the motion to vacate.

### Background

A federal grand jury indicted Polinski in May, 2011. *Polinski v. U.S.*, 2016 WL 3033552, *1 (N.D. Ohio) (*Polinski I*).

Polinski retained attorney Peter Rost, who had represented him in prior state-court cases, to represent him in the federal case. (Polinski's Hearing Ex. A at 5, Deposition of Peter Rost) (Rost Dep.). He agreed to pay Rost "a flat fee plus more if the case proceeded to trial." (Rost Dep. at 21). There is no writing in the record that documents these terms or defines the scope or duration of Rost's representation.

---

[1] I thank Professor Douglas Berman, of the Ohio State University's Moritz College of Law, who accepted the court's invitation to serve as *amicus curia* and filed a brief that was of assistance to the court. I also thank Richard M. Kerger, Esq., of Toledo, Ohio, for accepting the appointment as Mr. Polinski's attorney under the Criminal Justice Act, 18 U.S.C. § 3006.

Three months later, the United States filed a superseding information charging Polinski with two counts of being a felon in possession of a firearm, one count of possession of machine guns, and one count of unregistered manufacture of a firearm. *Polinski I*, *supra*, 2016 WL 3033552, at *1.

## A. Guilty Plea

In September, 2011, the parties entered into a written plea agreement. (Doc. 12).

As part of the agreement, Polinski stipulated that he was subject to the four-level enhancement under U.S.S.G. § 2K2.1(b)(4)(B). (Doc. 12 at ¶13). He also waived his direct-appeal rights, save for his right to appeal: 1) any punishment in excess of the statutory maximum; and 2) any sentence to the extent it exceeds the maximum of the sentencing range determined under the Guidelines. (*Id.* at ¶21).

Rost testified that he negotiated the plea agreement on Polinski's behalf and discussed its terms with him. (Rost Dep. at 4). He also answered a series of questions about the agreement that Polinski had written down and brought to one of their meetings. (*Id.* at 24; *see also* Rost Dep. Ex. 3).

Rost did not consider, however, whether the § 2K2.1(b)(4)(B) enhancement ought to apply given that Polinski never placed serial numbers on the machine guns that he made himself:

Q:     Do you recall discussing the machine guns and the serial numbers or the lack thereof on them with Mr. Polinski?

A:     Yes.

Q:     What do you recall about that conversation?

A:     Just as we went through the information, which was the last document, charging document, that was filed, and the probation initial report, we went through each paragraph and discussed the matter, including the paragraph and discussed the matter, including the paragraph that charged him, which I think

was Count 3, with possession of those instruments, weapons without serial numbers.

Q:    Did you raise with him the fact that it couldn't have been obliterated because they were never on there?

A:    I did not.

*   *   *

Q:    Prior to his plea, was that ever discussed in any way?

A:    That specific issue?

Q:    Yes.

A:    It was not.

*   *   *

Q:    Prior to his sentencing, was it discussed in any way?

A:    No. Not with me and not by me.

(Rost Dep. at 6–7; *see also id.* at 27–28).

Polinski corroborated Rost's account, testifying that Rost never advised him there was a basis to dispute the applicability of the § 2K2.1(b)(4)(B) enhancement. (Doc. 51 at 6).

At sentencing, I determined that Polinski's base offense level was twenty-nine – including the four-level enhancement under § 2K2.1(b)(4)(B) – and his criminal history was Category III. (Doc. 23 at 9–10, 16). This yielded a Guidelines range of between 108 months and 135 months of imprisonment. (*Id.* at 9–10). I imposed sentence at the bottom of that range. (Doc. 17 at 1).

4

## B. Attempts to Communicate with Rost

Polinski began serving his sentence at the Federal Correctional Institution in Milan, Michigan, where he started to "research[ing] stuff for [his] case." (Doc. 51 at 33). Thereafter, he transferred to the Federal Correctional Institution in Loretto, Pennsylvania.

On May 21, 2012 – little more than a month after sentencing – Polinski sent Rost a letter from Loretto FCI claiming that he should not have received the § 2K2.1(b)(4)(B) enhancement. (Doc. 19–2 at 2). "How can I get an altered or obliteration serial # enhancement," Polinski asked, "if I made [the firearms] and there never was one." (*Id.*). "At any rate," the letter continued, "I still want to appeal it like I told you at Court when I got sentenced." (*Id.*).

Rost agreed that he received this letter, but he testified that he had no recollection of taking any steps related to perfecting an appeal or preparing a § 2255 motion. (Rost Dep. at 12–13). Nor did he respond in any way to Polinski's letter. (Doc. 51 at 8).

Thereafter, from November, 2012, through April, 2014, Polinski wrote Rost three more letters, the contents of which I summarized in my earlier order:

> Polinski wrote to counsel again in November, 2012. "You are a hard man to reach," he told Rost, explaining that his wife had been trying, without success, to contact Rost. (*Id.* at 3). Polinski, who in the meantime had gathered "case law" that he wanted to discuss with Rost, asked Rost to "write me back and let me know my options" (*Id.*). "As you explained," he reminded counsel, "I only have one year to accomplish this." (*Id.*).

> Polinski sent Rost another letter on June 16, 2013. Polinski, who recognized that he was now "past my one year mark," wrote that his father had at some point talked to Rost, who told the elder Polinski that "a motion was filed in February." (*Id.* at 4). He asked for an update and reiterated that, despite repeated efforts, neither he nor his family could make contact with Rost. (*Id.*). Polinski concluded by asking Rost to "send me my file on what you have on my case so I can do research." (*Id.*).

> The next letter from Polinski to Rost that is in the record is dated April 12, 2014.

5

"What gives!," it begins:

> I have been trying to reach you by letter, my family has been trying to reach you by phone. Your office has blocked my calls. If this is a matter of money, please tell me and I can have my family arrange to send you some money.
>
> I have case law that will defintely [*sic*] help my case but I am at a loss why you didn't object to the things I got enhanced for. My family wants to call the bar if you don't respond to my letter but I am giving you a chance because you have been a family friend for years and I need my file.
>
> Please write me back as soon as possible.

(Doc. 19–2 at 5).

Rost wrote to Polinski, but not, it seems, until May 6, 2015 – more than a year after the letter just discussed. (Doc. 19–2 at 6).

Rost explained that he had received Polinski's "recent letter" and that he would try to get "the information you requested from your file." (*Id.*). Rost was dubious about that prospect, however, because his "original office building [had been] closed by the City of Toledo" and he was not "certain what files still remain." (*Id.*). Rost then gave Polinski the names and contact information of two Toledo attorneys who handle criminal appeals and postconviction matters. He told Polinski that "I do not handle any appeals[.]" (*Id.*).

Rost wrapped up by explaining that he would search for the file "but it may well have been shredded at the time the Spitzer Building was closed and our office moved." (*Id.*). Rost indicated that if Polinski's "father or family member wants to contact me please have them call my office number and if I am not in they must leave their name and number and I will certainly return the call." (*Id.*).

Polinski replied to this letter on June 1, 2015. (Doc. 19–2 at 7).

He thanked Rost for responding, but reiterated that: 1) he had written "multiple letters to try and get my case file to argue my enhancement but you never answered them"; and 2) Rost "was suppose [*sic*] to appeal the sentence but you never did." (*Id.*).

*Polinski II*, *supra*, --- F. Supp. 3d at ----, 2016 WL 7664733, at *2–3.

Polinski testified that he wrote as many as fifteen letters to Rost after sentencing, but the letters summarized above were the only ones he still had when he filed the § 2255 motion. (Doc. 51 at 8, 14; *see also* Polinski Hearing Exs. B, C, D, & E). The only response he ever received from Rost was the May, 2015 letter. (Doc. 51 at 8).

Polinski also called Rost's office regularly, hoping to speak with him about his case. (*Id.* at 9–12). A log of Polinski's outgoing calls from prison showed that he called Rost's offices twenty-eight times in 2013. (Polinski's Hearing Ex. H). Rost neither answered nor returned the calls. Polinski even enlisted friends and family members to call Rost, but their efforts, too, were unsuccessful.

Eventually, Polinski came to believe that Rost's office had "blocked" his calls. This was Polinski's understanding, he testified, because when he tried calling Rost's office, he heard a "warning over the phone saying you can't place a call to this number[.]" (Doc. 51 at 12).

At no point during this period, Polinski testified, nor at any point after sentencing did Rost tell him he was not his lawyer or that he no longer represented him. (*Id.* at 11–12).

### C. Filing the § 2255 Motion

Rost sent Polinski his case file sometime after Polinski wrote the June 1, 2015, letter. (*Id.* at 14, 16–17). With the file in hand, Polinski began preparing the motion to vacate. According to Polinski, he "felt that [he] couldn't proceed [on the motion] without [the case file.]" (*Id.* at 14).

Polinski acknowledged that, while he was in prison, he: 1) had "spoken to inmates just generally about legal issues"; 2) had conversations with inmates who styled themselves "jail house lawyers"; and 3) even had contact with "actual lawyers" who were serving prison sentences at Loretto FCI. (*Id.* at 32–34). In 2015, Polinski approached either the "jail house lawyers" or the

7

"actual lawyers" for help with "an outline for my brief" in support of the § 2255 motion. (*Id.* at 34). He did not, however, have any of those inmates work on the motion itself.

Asked whether he would "prefer to have your brief – your petition filed by a lawyer or by yourself," Polinski responded, "[B]y my lawyer because he studies the law." (*Id.* at 40).

In continuing to seek help from Rost, Polinski testified that he was relying, at least in part, on comments I made at sentencing. At that time I advised Polinski that, no matter the many rights he had waived as part of the plea agreement, he would not lose his right to counsel. According to Polinski:

> What I understood from you, Mr. Carr, is that when I was at sentencing and you asked me do I realize that this – that my lawyer was there with me from the beginning to the end, when I realized he was there with me from the beginning to the end, it was also – and also as well as filing the appeal as well. Whether he did the appeal – appellate law or not, I was under the understanding that he was – he was there from the beginning to the end.

(*Id.* at 42).[2]

Polinski filed his § 2255 motion on November 16, 2015, about five-and-a-half months after Polinski responded to Rost's sole letter to him. (Doc. 19). He alleged that trial counsel was ineffective for not: 1) contesting the § 2K2.1(b)(4)(B) enhancement; and 2) filing a notice of appeal.

The government opposed the motion on timeliness grounds, and I found that argument well-taken: Polinski's conviction became final on May 3, 2012 (when the time to file a notice of appeal expired), and his motion was due one year later. *Polinski II*, *supra*, --- F. Supp. 3d ----, 2016 WL 7664733, at *2. But I reserved ruling on Polinski's entitlement to equitable tolling, and on whether

---

[2] By hindsight, I realize that my comment about the lawyer being "there from the beginning to the end" were, at best, infelicitous, and at worst, as in this case, affirmatively, albeit unintentionally, misleading.

Polinski's claim that he was "actually innocent" of his sentence could excuse an untimely filing, pending the evidentiary hearing. *Id.* at *2, *4.

## Discussion

### A. Equitable Tolling

"[A] petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010).

### 1. Diligence

As to the diligence prong, what matters "for equitable tolling purposes is reasonable diligence, not maximum feasible diligence." *Id.* at 653 (internal quotation marks and citations omitted). And that is the very type of diligence that Polinski exercised here.

Roughly a month after sentencing, and by means of his own legal research, Polinski had discovered a *bona fide* challenge to the § 2K2.1(b)(4)(B) enhancement and the case law to back it up. (Doc. 19–1 at 4) (Polinski's brief in support of § 2255 motion citing *U.S. v. Seesing*, 234 F.3d 456, 460 (9th Cir. 2000)).

Armed with that information, Polinski reasonably turned to the person whom he believed he had hired to prosecute such a claim: Rost.

He wrote as many as fifteen letters to Rost, pleading with him to mount a legal challenge to the enhancement or, at the bare minimum, send him his case file so that Polinski could get underway himself. Polinski likewise made regular attempts to contact Rost by phone – twenty-eight calls in 2013, which comes to slightly more than one call every two weeks. Thereafter, Polinski could not successfully phone Rost's offices from prison; whenever he tried to do so, he got a message saying,

9

essentially, that Rost's offices had blocked the call. Finally, Polinski asked his friends and family to contact Rost.

All these efforts yielded a single response from Rost – his statement that he "do[es] not handle any appeals" – that did not come until more than three years after sentencing. When, in light of that letter, it became clear to Polinski that he was on his own – and after finally receiving the case file from Rost – Polinski immediately began work on the § 2255 motion and filed it within five or six months.

The government objects that Polinski should have been working on his own, and that he could have filed the motion sooner by taking advantage of the "jail house lawyers" and "actual lawyers" among the inmates at Loretto FCI.

This objection, which entirely overlooks Polinski's reasonable, good-faith belief – reenforced, as it were, by my comments at sentencing – that Rost was still bound to represent him, is meritless.

Critically, there is no evidence in the record – whether in the form of testimony from Rost or Polinski or a writing or fee agreement – defining the scope of Rost and Polinski's attorney-client relationship. Nor, consequently, is there any evidence specifying the event that would terminate that relationship. Moreover, Rost had previously represented Polinski several times, and Polinski considered Rost something of a "family friend." (Rost Dep. at 5). In the past, Polinski always paid Rost a lump sum on a "case-by-case" basis, and Polinski was never dissatisfied with Rost's performance.

In my view, this evidence speaks to the informal nature of the attorney-client relationship between Polinski and Rost.

10

While that is entirely unproblematic in the abstract, the absence of a clear line demarcating the end of Rost's obligations to Polinski in this case left the client vulnerable to a misunderstanding about the scope of his attorney's responsibilities. Indeed, the radio silence from Rost (who must have assumed (though on what basis is unknown) he no longer represented Polinski after sentencing), and the continual pleas for help from Polinski (who obviously believed Rost was still representing him), were predictable consequences of failing to set a clear limit on the representation.

For these reasons, I find that Polinski had a reasonable, good-faith belief that Rost was still his attorney. Thus, Polinski's efforts to work with Rost after sentencing are relevant to establishing, and do establish, his reasonable diligence.

Finally, I credit absolutely, and place a good deal of weight on, Polinski's testimony that he continued to rely on Rost, at least in part, because of my comments at sentencing.

After all, I told Polinski that whatever other rights he might be waiving by pleading guilty, he was not waiving his right to counsel. As I explained at the evidentiary hearing, such a comment, coming dressed in the court's authority, goes a long way toward justifying why "in good faith [Polinski] believed that Mr. Rost had a continuing obligation to represent him and work on his behalf." (Doc. 51 at 44).

### 2. Extraordinary Circumstances

Although a garden-variety claim of attorney negligence "does not generally give rise to equitable tolling," the Supreme Court has held that a "'serious instance[ ] of attorney misconduct' may rise to the level of an extraordinary circumstance necessary to justify equitable tolling." *Patterson v. Lafler*, 455 F. App'x 606, 609–10 (6th Cir. 2012) (quoting *Holland v. Florida*, 560 U.S. 631, 652 (2010)).

11

One type of serious misconduct that may warrant equitable tolling is attorney abandonment. *Maples v. Thomas*, --- U.S. ---, 132 S. Ct. 912 (2012) (recognizing that abandonment by counsel can excuse a procedural default); *Holland*, *supra*, 560 U.S. at 659 (Alito, J., concurring in part and concurring in judgment) ("Common sense dictates that a litigant cannot be held constructively responsible for the conduct of an attorney who is not operating as an agent in any meaningful sense of that word."); *Patterson*, *supra*, 455 F. App'x at 610.

In my earlier decision, I noted that "the record contains some evidence suggesting that Rost may have abandoned Polinski after sentencing." *Polinski II*, *supra*, --- F. Supp. 3d at ----, 2016 WL 7664733, at *4. That evidence fell into four categories:

- Rost did not file a notice of appeal on Polinski's behalf, despite Polinski's instruction to do so;

- Polinski's letters suggested there was "a repeated and long-standing failure" on Rost's part "to respond to his letters or provide him with information about his case";

- Rost allegedly made a misrepresentation when he told Polinski's father that he had filed a motion on Polinski's behalf in February, 2013, which may have explained why Polinski himself did not act sooner; and

- Rost did not clarify that he no longer represented Polinski until 2015.

*Id.*

After hearing the parties' evidence, I am convinced that this case presents a "serious instance[ ] of attorney misconduct [that] rise[s] to the level of an extraordinary circumstance" that "justif[ies] equitable tolling." *Patterson*, 455 F. App'x at 609–10.

First, there was undoubtedly a repeated and long-standing failure on Rost's part – a failure that lasted for three years, from May, 2012 until May, 2015 – to communicate in any way with Polinski. *Cf. Holland*, *supra*, 560 U.S. at 652 ("And [attorney] Collins failed to communicate with

his client over a period of years, despite various pleas from [habeas petitioner] Holland that Collins respond to his letters.").

The failure is all the more serious, and on par with the events in *Holland*, *supra*, given that Polinski, I am completely persuaded, was operating under a reasonable, good-faith belief that Rost was still representing him. That finding rests not only on the considerations I outlined above, but also on Polinski's testimony – which, as I have noted, I credit entirely – that Rost never told him that he no longer represented him. (Doc. 51 at 11–12).

Second, Polinski's letters urged Rost to act promptly so that Polinski would not miss his one-year filing deadline, but counsel let the deadline pass without taking any steps on Polinski's behalf – or even of telling Polinski that he was not longer his attorney. *Compare Polinski II*, *supra*, --- F. Supp. 3d at ----, 2016 WL 7664733, at *2 (Polinski urging Rost in November, 2012 to "write me back and let me know my options . . . As you explained . . .I only have one year to accomplish this") *with Holland*, *supra*, 560 U.S. at 652 ("Collins failed to file Holland's federal petition on time despite Holland's many letters that repeatedly emphasized the importance of his doing so").

Third, Rost did not respond in any whatsoever, whether to Polinski's many letters or his even more-frequent phone calls, until May, 2015.

Only then did he disclose the critical fact that he "do[es] not handle any appeals." (Doc. 19–2 at 2). He thus left Polinski in the dark as to whether their attorney-client relationship still existed, whether he would take any steps to vindicate Polinski's enhancement claim, and even whether he would turnover Polinski's file.

Fourth, there is some evidence to support Polinski's assertion that he learned from his father that Rost had filed a motion on his behalf in February, 2013.

13

At his deposition, Rost did not believe he had had such a conversation with Polinski's father. (Rost Dep. at 15). However, he testified that he did have some dealings with Polinski's stepfather, but that he did not "recall" whether he had any dealings with the stepfather around February, 2013. (*Id.*).

I do not give much weight to Rost's testimony, simply because, quite understandably, he now recalls little about this case. What he did recall was, at best, sketchy. Despite Polinski being a repeat client and tireless correspondent, for example, Rost did not recall receiving a single letter or call from Polinski.

I therefore find it plausible that the substance of a conversation between Rost and Polinski's father or stepfather would reach Polinski, and that he understood from this conversation that Rost had filed a motion of some sort on his behalf.

Of course, the testimony is important, not for showing whether there had been a filing, but rather for establishing Polinski's reliance on Rost and why, in light of that reliance, Polinski himself did not act sooner. And it goes without saying that Rost, by not responding to Polinski's letter about the supposed filing in February, 2013, did nothing to correct Polinski's misunderstanding.

Accordingly, I give some weight to Polinski's assertion that he believed Rost had filed some sort of motion on his behalf.

Fifth, Rost failed to heed Polinski's instructions to file a notice of appeal.

Polinski asked Rost to launch the appeal in his letter of May 21, 2012 (Doc. 19–2 at 2), but Rost did not perfect the appeal. This omission, standing alone, is *per se* deficient performance under *Strickland v. Washington*, 466 U.S. 668 (1984). *See Roe v. Flores-Ortega*, 528 U.S. 470, 478 (2000) ("If counsel has consulted with the defendant" about taking an appeal, "[c]ounsel performs in a

14

professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal.").

Finally, Polinski's retention of Rost reflected a long-term relationship. It was not one-off: Polinski had turned to Rost, who had represented him with some frequency – and, apparently, to Polinski's satisfaction – in state court proceedings. This, as well as Polinski's understanding that Rost was a "family friend," enhances the reasonableness of Polinski's belief that Rost would help him, rather than let him down.

Taken together, the evidence shows that extraordinary circumstances – Rost's total failure to communicate with Polinski, his failure to terminate the relationship unequivocally for three years, and Polinski's ensuing good-faith belief that Rost was still representing him, among others – prevented Polinski from making a timely filing.

I therefore hold that Polinski is entitled to equitable tolling from May 3, 2012, when Polinski's judgment became final, until June 1, 2015, when Polinski acknowledged the letter in which Rost said he no longer represented Polinski. Because Polinski filed his § 2255 motion within five-and-a-half months after that date, the statute of limitations does not bar Polinski's motion.

### B. Actual Innocence of the Sentence

As an alternative ground to avoid the statute of limitations, Polinski argues that he is "actually innocent" of his sentence. Polinski does not claim to be innocent of the firearms offenses to which he pleaded guilty. Rather, he maintains that there is no evidence whatsoever to show that he engaged in the conduct that § 2K2.1(b)(4)(B) forbids: altering or obliterating a firearm's serial number.

"In extraordinary cases, a petitioner may raise a claim of actual innocence 'to avoid a procedural bar to the consideration of the merits of his constitutional claim.'" *Lee v. Brunsman*, 474 F. App'x 439, 442 (6th Cir. 2012) (quoting *Schlup v. Delo*, 513 U.S. 298, 326–27 (1995)).

In *McQuiggen v. Perkins*, --- U.S. ---, 133 S. Ct. 1924, 1935 (2013), the Supreme Court held that an actual-innocence claim can excuse compliance with the statute of limitations in 28 U.S.C. § 2244(d), which governs state prisoners' habeas cases. Given the parallels between § 2244(d) and § 2255(f), courts to consider the issue have applied *Perkins* in § 2255 cases. *E.g.*, *Kalchstein v. U.S.*, 2013 WL 6499592, *2–3 (W.D.N.C.); *U.S. v. Esquivel*, 2013 WL 6283916, *2–3 (S.D. Tex.).

"To establish actual innocence, 'a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Lee*, *supra*, 474 F. App'x at 442 (quoting *Schlup*, *supra*, 513 U.S. at 326–27)). "Actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. U.S.*, 523 U.S. 614, 623 (1998).

### 1. The Circuit Split

The *Perkins* exception applies when a petitioner shows he is "actually innocent" of the underlying offense.

As far as being "actually innocent" of a sentence, the Supreme Court has decided only that one can be "actually innocent" of a death sentence. *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992) (defendant is actually innocent of death sentence if he shows by clear and convincing evidence that, "but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty"). In *Dretke v. Haley*, 541 U.S. 386, 388–89 (2004), the Court granted certiorari to decide whether one can be "actually innocent" of a non-capital sentence, but the Court did not reach the merits.

16

In the absence of Supreme Court guidance, the Circuits have split on the issue.

The Second Circuit has held that the actual-innocence exception applies if the defendant shows by clear and convincing evidence "that he is actually innocent of the act on which his harsher sentence was based." *Spence v. Superintendent, Great Meadow Corr. Facility*, 219 F.3d 162, 172 (2d Cir. 2000).

The Fourth and Fifth Circuits have also recognized the exception for noncapital sentences, but they have limited it to cases where the defendant is "actually innocent" of a habitual-offender enhancement. *U.S. v. Mikalajunas*, 186 F.3d 490, 495 (4th Cir. 1999); *Haley v. Cockrell*, 306 F.3d 257, 264–66 (5th Cir. 2003), *vacated on other grounds by Dretke*, *supra*, 541 U.S. at 388–89.

Other Circuit have held that the actual-innocence exception does not apply to noncapital sentencings. *Embrey v. Hershberger*, 131 F.3d 739, 740–41 (8th Cir. 1999) (en banc); *U.S. v. Richards*, 5 F.3d 1369, 1371 (10th Cir. 1993). Still other courts have declined to resolve the question. *E.g.*, *Cristin v. Brennan*, 281 F.3d 404, 422 (3d Cir. 2002).

## 2. The Sixth Circuit Does Not Recognize Actual-Innocence Claims in the Context of Guidelines Calculations

The Sixth Circuit "has not yet issued a published opinion that addresses whether the actual innocence exception extends to noncapital sentences[.]" *Gibbs v. U.S.*, 655 F.3d 473, 478 (6th Cir. 2011). In *Gibbs*, however, the Circuit held that even if an "actual innocence" exception were available in noncapital sentencings, the exception would not "permit prisoners to raise claims about guidelines calculations in a collateral attack." *Id.*

The defendant in *Gibbs* alleged that he was "actually innocent" of a sentence that the district court enhanced based on a prior state-court narcotics conviction. *Id.* at 474. This was so, the

17

defendant maintained, because the district court had wrongly concluded that the prior conviction was a "controlled substance offense" under U.S.S.G. §§ 4B1.2(b), a finding that resulted in a fourteen-level increase in the defendant's base offense level. *Id.* at 474.

The Circuit determined that this claim was not, in fact, an innocence claim at all – and thus it was "not necessary" for the court "to resolve whether the 'actual innocence' exception extends to the noncapital sentencing context." *Id.* at 478.

Nevertheless, the court went on to hold that Guidelines claims like the defendant's – which was merely a "challenge[ ] to the legal process used to sentence a defendant," *id.* at 479 – cannot serve as the predicate for an actual-innocence claim:

> First, allowing defendants to raise such claims would be contrary to the [Supreme] Court's language limiting the exception to "extraordinary cases." Challenges to guidelines calculations are omnipresent in our federal system, and we believe the Court did not intend for the "rare" exception of actual innocence to permit such a common form of appeal.
>
> Second, sentencing guidelines calculations do not affect a defendant's eligibility for a sentence, and cases that have previously considered "actual innocence" claims in the sentencing context are distinguishable. In *Sawyer v. Whitley*, for example, the Supreme Court explained that, in the capital-sentencing context, the "actual innocence inquiry "focuses on those elements that render a defendant eligible for the death penalty." 505 U.S. at 347. "To show 'actual innocence' in the sentencing context, the petitioner "must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the penalty under the applicable law." *Id.* at 336. Based on *Sawyer*, courts that have permitted "actual innocence" claims in the noncapital sentencing context have focused on the same principle – eligibility for the sentence received.
>
> In federal sentencing cases, federal law authorizes an imprisonment range. While the sentencing guidelines are used as a starting point for determining where within the statutorily-set range a prisoner's sentence should fall, the guidelines themselves are advisory. A challenge to the sentencing court's guidelines calculation, therefore, only challenges the legal process used to sentence a defendant and does not raise an argument that the defendant is ineligible for the sentence she received. The Supreme Court did not intend the "actual innocence" exception to save such procedural claims.

*Id.* at 478–79 (internal citations and brackets omitted).

The Circuit returned to the "actual innocence" question in *Lee*, *supra*, 474 F. App'x 439, a state prisoner's habeas case. There the petitioner alleged that he was "actually innocent" of an enhanced sentence because the judge who sentenced him engaged in the sort of judicial factfinding that *Blakely v. Washington*, 542 U.S. 296 (2004), had prohibited. *Id.* at 440.

Because the court found that this claim was not a true innocence claim – it was, rather, a claim that the "sentencing was procedurally defective[,]" *id* at 443 – the court did not decide whether the innocence exception extends to noncapital sentencings. But the court paused to emphasize that "a legitimate actual-innocence argument is a challenge to the correctness of a factual predicate that was a prerequisite to the petitioner's sentence":

> Lee argues that we should follow the Second and Third Circuits, which, Lee argues, apply the exception in contexts similar to this case. Lee cites in support *Cristin v. Brennan*, 281 F.3d 404 (3d Cir. 2002) and *Spence v. Superintendent, Great Meadow Corr. Facility*, 219 F.3d 162 (2d Cir. 2000). However, these cases are inapposite.
>
> The *Cristin* court declined to take a position on whether the actual-innocence exception might apply in non-capital cases. *Cristin*, 281 F.3d at 422. Rather, the court simply rejected the petitioner's argument that he was actually innocent of the excessively long sentence that he received because the petitioner had provided no basis "for concluding that some factual finding at sentencing was erroneous." *Id.* The court noted that the "courts that have extended *Sawyer*'s holding on the 'actual innocence' of a sentence have uniformly done so in the context of testing the factual findings on which a particular non-capital sentence is based, such as prior convictions." *Id.*
>
> The *Spence* decision, too, emphasizes that the actual-innocence exceptions concerns challenges to erroneous factual findings. In *Spence*, the sentencing court concluded that the petitioner had committed an act that was a prerequisite to his receiving a sentence of jail time rather than probation. In his habeas petition, the petitioner challenged the sentencing court's erroneous factual determination that he had actually committed the act. The court concluded that the petitioner met the actual-innocence exception.

> Both *Cristin* and *Spence* are consistent with the idea that – if the actual-innocence exception applies in the non-capital context – a legitimate actual-innocence argument is a challenge to the correctness of a factual conclusion that was a prerequisite to the petitioner's sentence.

*Id.* at 442–43 (internal citation and quotation omitted).

After *Gibbs* and *Lee*, a successful claim that one is "actually innocent" of a noncapital sentence must challenge "the correctness of a factual conclusion that was a prerequisite to a [defendant]'s sentence." *Lee*, *supra*, 474 F. App'x at 443. More than that, the defendant must establish that, but for the erroneous factual finding, he would be "ineligible for the sentence she received." *Gibbs*, *supra*, 655 F.3d at 479.

### 3. *Gibbs* Forecloses Polinski's Innocence Claim

It is undisputed that there is no proof whatsoever to support the § 2K2.1(b)(4)(B) enhancement that Polinski received in this case. (Doc. 51 at 6, 24–25). Because Polinski manufactured the machine guns himself, and because he did not place any serial numbers on those guns, there was no evidentiary basis for the "altered or obliterated" enhancement. *E.g.*, *U.S. v. Seesing*, 234 F.3d 456, 460 (9th Cir. 2000) (§ 2K2.1(b)(4)(B) enhancement does not apply to homemade weapons without serial numbers).

For that reason, Polinski's innocence claim is fundamentally different, and more compelling, than the claims at issue in *Gibbs* and *Lee*: Polinski is challenging "the correctness of a factual conclusion" that was a key predicate to the sentence he received. *Lee*, *supra*, 474 F. App'x at 443. And but for that factually unsupported enhancement, the applicable Guidelines range – and thus, barring any unusual circumstances, the *de facto* minimum and maximum penalties – would have been between 87 and 108 months of imprisonment.

But *Gibbs* forecloses Polinski's claim.

Even though the factually unsupported enhancement was a but-for cause of Polinski's 108-month sentence, Polinski was nevertheless eligible for that sentence even without the § 2K2.1(b)(4)(B) enhancement: by statute, the maximum sentence to which Polinski's guilty plea exposed him was ten years of imprisonment. (Doc. 12 at ¶2; Doc. 14 at 20–21).

As the Circuit explained in *Gibbs*, *supra*, 655 F.3d at 479, "[a] challenge to the sentencing court's guidelines calculation . . . only challenges the legal process used to sentence a defendant and does not raise aan argument that the defendant is ineligible for the sentence she received."

Thus, on the authority of *Gibbs*, I must reject Polinski's actual-innocence claim.

### C. Ineffective Assistance of Trial Counsel

Finally, I come to the merits of Polinski's ineffective-assistance claim.

To prevail, Polinski must "show both that his counsel provided deficient assistance and that there was prejudice as a result." *Harrington v. Richter*, 562 U.S. 86, 104 (2011).

The performance prong calls for "an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Id.* My review of counsel's performance is highly deferential, and I am "required not simply to give [counsel] the benefit of the doubt, but to affirmatively entertain the range of possible reasons counsel may have had for proceeding as [they] did." *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011).

"With respect to prejudice, a challenger must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Harrington*, *supra*, 562 U.S. at 104. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

21

### 1. Performance

Here, Polinski has rebutted the "strong presumption" that trial counsel's performance fell within the "wide range" of reasonable professional assistance. *Id.* at 689.

First, Rost did not file a notice of appeal or otherwise challenge the unfounded enhancement, despite Polinski's instructions to do so. (Doc. 19–2 at 2; Rost Dep. at 10, 13). As already noted, this omission, standing alone, amounts to deficient performance. *Flores-Ortega*, *supra*, 528 U.S. at 478 ("If counsel has consulted with the defendant" about taking an appeal, "[c]ounsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal.").

To be sure, Polinski had waived essentially all of his appellate rights when he pleaded guilty, and the Sixth Circuit would almost surely have enforced the waiver and rejected any challenge to the § 2K2.1(b)(4)(B) enhancement. But given's Polinski's instructions, Rost had no discretion to refuse to perfect the appeal on the ground that the appeal would be fruitless. *Flores-Ortega*, *supra*, 528 U.S. at 478.

Second, Rost's failure to contest whether the § 2K2.1(b)(4)(B) enhancement applied in this case fell below an objective standard of reasonableness. Rost testified quite clearly and forthrightly that he never considered whether to mount a challenge to that enhancement. (Rost. Dep. at 6–7). Nor did he "do any research to see if that was an appropriate charge based on the facts of th[e] case[.]" (*Id.* at 36).

Although all parties to the case – the prosecutor, Rost, the presentence report writer, and I – did not question the propriety of the enhancement, its applicability was not an obscure or debatable

issue. (But it was left to the one person least knowledgeable to make the error clear. In a word, the "system" failed Polinski).

For one thing, the mildly unusual nature of the case against Polinski – namely, that he was making firearms himself – ought to have alerted *someone* – and most of all counsel – to a potential mismatch between the homemade weapons and the "altered or obliterated" enhancement. (It would seem, for example, quite unreasonable to think that Polinski, who was already a convicted felon, would be making firearms that had serial numbers on them, as federal law required.).

For another, several courts of appeals had held, prior to Polinski's plea, that the § 2K2.1(b)(4)(B) enhancement is inapplicable to homemade weapons. *Seesing*, *supra*, 234 F.3d at 460 (it was plain error to apply the § 2K2.1(b)(4)(B) enhancement where "[t]he government does not argue that Seesing's [homemade] silencer had any serial number, much less one that was altered or obliterated"); *U.S. v. Bakhtiari*, 913 F.2d 1053, 1063 (2d Cir. 1990) (enhancement did not apply to homemade silencer); *cf. U.S. v. Laughrin*, 438 F.3d 1245, 1249 (10th Cir. 2006) (enhancement did not apply to firearm that "was manufactured before 1969, the year serial numbers became required by law").

Rost having advised his client to enter a guilty plea, moreover, it was his real – indeed, only – task in this case to ensure that Polinski received a fair and appropriate sentence. But Polinski's sentence was vulnerable to challenge insofar as it included the four-level enhancement for "altered or obliterated" firearms. By his own admission, however, counsel did not research or investigate that issue. And the record does not suggest a reasonable basis for omitting an objection directed at the enhancement.

Accordingly, I find that defense counsel's performance was objectively unreasonable.

23

## 2. Prejudice

I likewise conclude that counsel's failure to challenge the § 2K2.1(b)(4)(B) enhancement was prejudicial.

Had counsel raised the issue, there is no question I would have sustained the objection and struck the enhancement. As at least three circuits have recognized, the "altered or obliterated" enhancement presupposes that the firearm at issue had a serial number that one could alter or obliterate. But that supposition is invalid if the weapons at issue lacked serial numbers in the first place:

> Both the Second and Ninth Circuits have held that the clear language of USSG § 2K2.1(b)(4) prohibits its application when the defendant possessed a weapon that had never borne a serial number. *See United States v. Bakhtiari*, 913 F.2d 1053, 1063 (2d Cir. 1990) (homemade silencer); *United States v. Seesing*, 234 F.3d 456, 460 (9th Cir. 2001) (same). The government challenges the reasoning of *Bakhtiari* and *Seesing*, arguing that the manufacturer of a weapon who neglects to affix a serial number should be treated identically to someone who removes a serial number from a weapon manufactured by someone else. The court in *Bakhtiari* acknowledged the policy argument in favor of such equivalent treatment but decided that it was bound by the guidelines language:
>
>> To be sure, the government's position on this score has some logical force – a court should treat as similar on the one hand a defendant who affirmatively obliterates a serial number and, on the other, one who personally designs a silencer [or fashions a sawed-off shotgun] and never affixes a serial number in the first place. We are bound, however, by the provision the Sentencing Commission did in fact adopt, and that provision specifically applies only to those firearms which "[were] stolen or [have] an altered or obliterated serial number.
>
> *Bakhtiari*, 913 F.2d at 1063. We agree.
>
> Moreover, even if we would have been inclined to disagree with the decisions by our fellow circuits as a matter of first impression, their persuasive force has been magnified by the Sentencing Commission's apparent agreement with these decisions. The Sentencing Commission has amended § 2K2.1 twelve times since *Bakhtiari* was decided in September 1990. *See* USSG § 2K2.1 historical note (2005). None of those

24

amendments changed the language of subsection (b)(4). In addition, in 1993 the Commission specifically addressed § 2K2.1(b)(4) by adding what is now application note 16, which states that the § 2K2.1(b)(4) enhancement applies regardless of the defendant's knowledge that the firearm was stolen or had an altered or obliterated serial number, but it made no reference to firearms that never had a serial number. *See id.* app. C vol. I, amd. 478 (2003). "We ... interpret and apply the sentencing guidelines in a manner consistent with the Sentencing Commission's intent." *United States v. O'Flanagan,* 339 F.3d 1229, 1235 (10th Cir.2003). "A fundamental rule of statutory construction is that we presume Congress, when reenacting a statute without change, adopts uniform judicial interpretations given a particular word, phrase, or provision." *Id.* And this same approach applies when construing the guidelines. *See id.* The Sentencing Commission's failure to make any change in the language of § 2K2.1(b)(4) in the years since *Bakhtiari* and *Seesing* were decided "suggest[s] that the Sentencing Commission was content with [those] interpretation[s]." *Id.* at 1235.

*Laughrin*, *supra*, 438 F.3d at 1248–49.

Because the firearms at issue were homemade, the § 2K2.1(b)(4)(B) enhancement does not apply. *Id.*; *Seesing*, *supra*, 234 F.3d at 460; *Bakhtiari*, *supra*, 913 F.2d at 1063. Counsel's unreasonable failure to challenge the enhancement resulted in a twenty-one-month increase in the minimum applicable Guidelines sentence, from a range of 87 to 108 months to a range of 108 to 135 months.

Finally, I believe there is a reasonable probability that, had the low end of the Guidelines range been below 108 months, I would have sentenced Polinski to a term of imprisonment shorter than 108 months. More often than not, I vary downwards at sentencing; in any event, I rarely impose a high-end sentence.

Polinski has therefore shown prejudice.[3]

---

[3] Polinski cannot show prejudice from the failure to file a notice of appeal: given the terms of the appeal waiver (Doc. 12 at ¶21), there was no possibility the Sixth Circuit would have allowed Polinski to challenge the enhancement.

25

**D. Remedy**

"If the court finds that the petitioner's judgment was unlawful . . . 'the court shall vacate and set aside the judgment aside.'" *Ajan v. U.S.*, 731 F.3d 629, 631 (6th Cir. 2013) (quoting 28 U.S.C. § 2255(b). After vacating the judgment, the court must either "discharge the prisoner or resentence him or grant a new trial or correct the sentence as may be appropriate." 28 U.S.C. § 2255(b).

Here, the appropriate remedy is to resentence Polinski to a term of imprisonment within the 87-to-108-month range that, but for the violation of Polinski's right to effective assistance of counsel, would have applied at the original sentencing. I will therefore set this case for resentencing and proceed to resentence Polinski as soon as practicable unless the government gives notice of its intent to appeal.

**Conclusion**

It is, therefore,

ORDERED THAT:

1.      Polinski's motion to vacate under 28 U.S.C. § 2255 (Doc. 19) be, and the same hereby is, granted;

2.      Polinski's sentence be, and the same hereby is, vacated;

3.      This case will be set for resentencing on a date mutually agreeable to the parties and as soon as practicable, unless the government gives notice of its intent to appeal.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge

26